**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STRATEGIC LEARNING, INC.,** | : | **CIVIL ACTION NO. 1:05-CV-0467** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **THOMAS WENTZ and CORPORATE** | : | |
| **PERFORMANCE SYSTEMS,** | : | |
| | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

Presently before the court are: (1) the motion for summary judgment

(Doc. 15), filed by defendants Thomas Wentz and Corporate Performance Systems

(collectively "defendants"), and (2) the motion for partial summary judgment

(Doc. 22), filed by plaintiff Strategic Learning, Inc. ("Strategic").  For the reasons

that follow, summary judgment will be granted in part and denied in part.

I.    <u>Statement of Facts</u>

A.    <u>The Parties</u>

Strategic is a business consulting organization that specializes in developing

strategic initiatives and training employees to implement those initiatives.  (Doc. 14

¶¶ 1-2.)  As a component of its business, Strategic entered into a contract to become

an "authorized representative" of Wilson Learning Corporation ("Wilson"), a

company that develops business consulting programs and markets them through

such representatives.  (Doc. 16 ¶¶ 3, 4; Doc. 29 ¶¶ 3, 4; <u>see also</u> Doc. 17, Ex. 12.)

Defendant Corporate Performance Systems ("CPS") is also a business consulting organization and an authorized representative of Wilson.  (Doc. 16 ¶ 1; Doc. 29 ¶ 1; Doc. 32, Ex. J at 1.)  Defendant Thomas Wentz ("Wentz") is CPS's president and sole shareholder.  (Doc. 16 ¶ 1; Doc. 29 ¶ 1.)

### B.    The Initial Contract Between the Parties

In 2001, Strategic entered into discussions with York International Corporation ("York") about the possibility of conducting a sales training program for the company.  (Doc. 13, Ex. 3 at 1.)  York agreed to permit Strategic to conduct a pilot sales training program in August 2001.  (Doc. 13, Ex. 5 at 4.)  The pilot program was to involve a Wilson product called "Counselor Salesperson."  (Doc. 16 ¶¶ 4, 6; Doc. 29 ¶¶ 4, 6.)  To facilitate the program, Strategic enlisted Wentz.[1]  (Doc. 16 ¶ 6; Doc. 29 ¶ 6.)  Pursuant to an oral contract, Strategic agreed to provide York with written materials from Wilson, and Wentz agreed to facilitate the program for $2,500 per day.[2]  (Doc. 16 ¶ 6; Doc. 29 ¶ 6.)  Wentz facilitated the pilot program on August 21-23, 2001, and Strategic paid Wentz the agreed-upon fee.  (Doc. 16 ¶ 6;

---

[1] An issue of fact remains as to whether Strategic hired Wentz in his capacity as a CPS employee or in his individual capacity.  (Compare Doc. 16 ¶¶ 5-6, with Doc. 29 ¶¶ 5-6.)  References to Wentz in this statement of facts should not be construed as indicating that he was acting in a particular capacity.

[2] The remaining terms of the oral contract are disputed.  See infra note 10.

2

Doc. 29 ¶ 6.)  Thereafter, Wentz continued to facilitate programs at York,[3] and

Strategic continued to pay Wentz.[4]  (Doc. 16 ¶ 9; Doc. 17, Ex. 3; Doc. 29 ¶ 9.)

      **C.**      **The Dispute Between the Parties**

          **1.**      **Wentz's "Independent" Consulting Work**

In November 2002, Wentz facilitated a sales training program for York

without Strategic's involvement.  (Doc. 13, Ex. 7.)  For this program, Wentz billed

York directly, at a rate of $5,000 per day.  (See Doc. 13, Ex. 7.)  Wentz maintained

that this program did not involve Wilson products and that, as a result, he was free

to conduct it without Strategic's involvement.  (Doc. 17, Ex. 5 at 5; Doc. 31 ¶ 31;

Doc. 32, Ex. J ¶ 32.)  Wentz also requested that he be permitted to continue to

provide such independent consulting services to York and offered to pay Strategic a

"finder fee" for such work.  (Doc. 32, Ex. J at 36.)  Strategic countered that,

pursuant to the parties' oral agreement, Wentz was neither authorized to bill York

directly nor to work with York independently.  (Doc. 17, Ex. 10 at 4.)  As a result,

Strategic maintained that it was entitled to reimbursement from Wentz for the

November 2002 session.  (Doc. 17, Ex. 5 at 1.)

---

[3] Wentz facilitated at least nine more programs between April 2002 and
January 2003.  (Doc. 17, Ex. 3.)

[4] At Wentz's request, Strategic increased the agreed-upon fee of $2,500 per
day to $3,000 per day, but the circumstances of that increase are disputed.
(Compare Doc. 1 ¶¶ 34-35, and Doc. 14 ¶ 20-21, and Doc. 16 ¶ 8, with Doc. 4 ¶¶ 34-35,
and Doc. 29 ¶ 8, and Doc. 31 ¶ 20.)

### 2.   **Wentz's Request for Additional Compensation**

According to Wentz, York became dissatisfied with the program's price and

inquired whether Wentz would be able to conduct the program for a lower price if

Strategic were not involved.  (Doc. 17, Ex. 4 at 5.)  Believing York to be a "protected

customer" of Strategic,[5] Wentz responded that he could not.  (Doc. 17, Ex. 4 at 5.)

Wentz, however, told Strategic about this conversation and suggested that Strategic

lower its prices to meet York's needs.  (Doc. 17, Ex. 4 at 5.)  Strategic responded by

explaining that its prices reflected the provision of customized materials, including

"some original Tom Wentz intellectual capital," to York.  (Doc. 17, Ex. 4 at 2.)

Thereafter, Wentz became concerned that Strategic had been charging York

a premium for materials that Wentz had "customized" at his own expense.[6]

(Doc. 16 ¶ 10; Doc. 17, Ex. 5 at 4-5.)  Wentz also felt that he had been acting both as a

sales associate and as a facilitator and should be compensated accordingly.

(Doc. 17, Ex. 5 at 4-5.)  Therefore, Wentz submitted a proposal to Strategic in which

he requested $35,290 in additional compensation for work he had previously

---

[5] Wilson permits its authorized representatives to develop a list of "protected
customers."  (See Doc. 17 at 2.)  Once a customer becomes "protected," the
authorized representative has the "exclusive right to sell [Wilson] Products and
Programs, including facilitation services" to that customer.  (Doc. 14, Ex. D.)
It is undisputed that York became a "protected customer" of Strategic, but the
parties dispute when that designation occurred.  (See Doc. 14, Ex. C.)

[6] Wentz admits that he initially agreed to customize the program using his
own copyrighted material at no additional cost to Strategic.  (Doc. 32, Ex. J ¶ 15.)  It
was not until he learned that Strategic had been charging York a premium for this
customized material that he requested additional compensation.  (Doc. 32, Ex. J
¶ 24.)

completed.[7]  (Doc. 17, Ex. 5 at 4-5.)  Strategic responded with an offer of $15,000,

which Wentz swiftly rejected.  (Doc. 17, Ex. 5.)

### 3.   The Parties' Double Billing of York

In February and March of 2003, Wentz provided five days of facilitation

services to York.  (Doc. 16 ¶ 15; Doc. 29 ¶ 15.)  York paid Strategic $5,000 per day for

these facilitation services; however, Strategic did not pay Wentz, intending to

"offset the payment due" for the independent consulting session Wentz had

previously conducted for York.  (Doc. 16 ¶¶ 16-17; Doc. 17, Ex. 11 at 36; Doc. 29

¶¶ 16-17.)  Wentz responded by billing York directly for the completed work.

(Doc. 16 ¶ 18; Doc. 17, Ex. 7.)  This double billing created some discontentment at

York, so York again proposed that Wentz facilitate all future programs without

Strategic's involvement.  (Doc. 13, Ex. 9.)  York also informed the parties that it

would contact Wilson directly if necessary to resolve the dispute.[8]  (Doc. 13, Exs. 9,

10 at 2.)  Finally, York suggested a compromise position — all future billing was to

be separated, with Strategic billing for materials and Wentz billing for facilitation.

(Doc. 17, Ex. 8 at 1.)  However, Strategic refused to permit direct billing by Wentz.

---

[7] According to Wentz, he was entitled to compensation for "Customization, Royalties, and Sales Support for the Counselor Selling sessions facilitated for York International in 2001 through January 2003."  (See Doc. 32, Ex. E at 2-3.)

[8] Before York could contact Wilson, Wentz "advised" York that he was "a free agent as a facilitator" and that he could contract his services "independently to York."  (Doc. 13, Ex. 10 at 1.)  He also advised that his relationship with Strategic was an "ethical" and not a "legal" one.  (Doc. 13, Ex. 10 at 1.)

(Doc. 17, Ex. 8 at 3, 6; Ex. 10 at 4.)  As a result, York contacted Wilson to request the written materials directly from them, and Wilson complied.  (Doc. 17, Ex. 9.)

### 4. **Wentz's Attempts to Collect**

Wentz repeatedly asked Wilson for "help" in collecting the money that he alleged Strategic owed him.  (Doc. 14 ¶ 42; Doc. 31 ¶ 42.)  On November 6, 2003, Wentz asked Wilson to deduct his fee from commission fees that Wilson owed Strategic.  (Doc. 13, Ex. 14 at 1.)  Eight days later, Wentz asked Wilson to put a "credit hold" on any requests for supplies made by Strategic.  (Doc. 13, Ex. 13; Doc. 14 ¶ 41; Doc. 31 ¶ 41.)  Wentz also asked Wilson not to give Strategic any sales awards in light of their "unethical practices."  (Doc. 13, Ex. 15; Doc. 14 ¶ 43; Doc. 31 ¶ 43.)

Several months later, Wilson notified Wentz that he had violated his representative agreement with Wilson in several respects, including attempting to sell a Wilson product to a "protected customer" of another Wilson representative.  (Doc. 14, Ex. A; 31 ¶¶ 46-48.)  Wentz denied these allegations.  (Doc. 14, Ex. B; Doc. 31 ¶¶ 46-48.)  Wilson advised Wentz to terminate "any discussions with the York account about [Wilson] other than as permitted by the Protected Account Representative."  (Doc. 14, Ex. D.)  Wilson also advised Wentz that York employees would not be permitted to attend any "open or public Counselor Salesperson seminars" that he chose to conduct.  (Doc. 14, Ex. D.)

D.    **Aftermath**

In March 2004, Strategic conducted a pilot presentation of a new version of Counselor Salesperson at York using a facilitator other than Wentz.  (Doc. 16 ¶ 23; Doc. 29 ¶ 23; Doc. 31 ¶ 58.)  Thereafter, York and Strategic discussed organization-wide implementation of this new version.  (Doc. 16 ¶ 24; Doc. 29 ¶ 24.)  However, such organization-wide implementation has not occurred.  (Doc. 14 ¶ 58.)  In addition, York has advised that it would prefer to use Wentz to facilitate future programs.  (Doc. 17, Ex. 10 at 7.)  However, such future programs have been put "on hold" because of the unrest between Strategic and Wentz.  (Doc. 13, Ex. 8 at 1.)

Both Strategic and Wentz remain authorized representatives of Wilson. (Doc. 16 ¶ 22; Doc. 29 ¶ 22.)  Wentz continues to conduct "open" Counselor Salesperson seminars, which are not targeted specifically to York.  (Doc. 31 ¶ 57.) Strategic has been fully paid for all services it has provided to York to date.  (Doc. 16 ¶ 31; Doc. 29 ¶ 31.)

E.    **Procedural History**

Strategic filed a complaint in the U.S. District Court for the Eastern District of Pennsylvania, raising claims of:  (1) tortious interference with contract, (2) breach of fiduciary duty, (3) breach of contract, (4) breach of the implied covenant of good faith and fair dealing, (5) promissory estoppel, and (6) defamation.  (See Doc. 1-1.) Strategic also claimed entitlement to attorney's fees for its tortious interference, breach of fiduciary duty, and defamation claims.  (See Doc. 1-1.)  The Eastern District dismissed Strategic's defamation claim and attorney's fee demand and

7

transferred the case to this court.  (See Doc. 1-18.) Defendants filed numerous

counterclaims, including a claim of breach of contract.  (See Doc. 4.)  Defendants

filed a motion for summary judgment, requesting that judgment be entered in their

favor on all counts of Strategic's complaint and on their breach of contract

counterclaim.  Strategic filed a motion for partial summary judgment, requesting

that judgment be entered in its favor on its tortious interference with business

relations and breach of fiduciary duty claims.  These motions have been fully

briefed and are ripe for disposition.

## II.   <u>Standard of Review</u>

Through summary judgment the court may dispose of those claims that do

not present a "genuine issue as to any material fact," and for which a jury trial

would be an empty and unnecessary formality.  <u>See</u> FED. R. CIV. P. 56(c).  It places

the burden on the non-moving party to come forth with "affirmative evidence,

beyond the allegations of the pleadings," in support of its right to relief.  <u>Pappas v.

City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); <u>see

also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence must be

adequate, as a matter of law, to sustain a judgment in favor of the non-moving party

on the claims.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986);

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see

also</u> FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action

proceed.  <u>Pappas</u>, 331 F. Supp. 2d at 315.

8

The court is permitted to resolve cross-motions for summary judgment concurrently. InterBusiness Bank, N.A. v. First Nat'l Bank of Mifflintown, 318 F. Supp. 2d 230, 235 (M.D. Pa. 2004) (describing concurrent resolution of cross-motions for summary judgment as "a formidable task"); see also 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 1998). When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion. FED. R. CIV. P. 56; United States v. Hall, 730 F. Supp. 646, 648 (M.D. Pa. 1990).

### III.   <u>Discussion</u>[9]

Defendants contend that they are entitled to summary judgment on Strategic's claims of breach of contract and breach of the implied covenant of good faith and fair dealing, as well as on all of Strategic's tort claims. To the contrary, Strategic contends that it is entitled to summary judgment on all of its tort claims. Defendants also contend that they are entitled to summary judgment on all of Strategic's remaining claims because Strategic has failed to prove damages. Finally, defendants contend that they are entitled to summary judgment on their own breach of contract counterclaim. The court will address these issues *seriatim*.

---

[9] Jurisdiction over all of the parties' claims is based on diversity of citizenship, see 28 U.S.C. § 1332, and none of the parties dispute the applicability of Pennsylvania law, see Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79-80 (1938); see also Borse v. Piece Goods Shop, Inc., 963 F.2d 611, 613 (3d Cir. 1992) (noting that federal courts sitting in diversity must apply the substantive law of the state of the forum state).

A.    **Strategic's Breach of Contract Claim**

The dispute in this case centers around an oral contract pursuant to which Wentz agreed to facilitate sales training programs for Strategic.  The parties agree that such a contract existed.  (Doc. 4 ¶ 83; Doc. 11 ¶ 83.)  However, the parties dispute the terms of the contract.[10]  Ascertaining the terms of an oral contract is a task reserved for the trier of fact.  <u>Johnston the Florist, Inc. v. Tedco Constr. Corp.</u>, 657 A.2d 511, 516 (Pa. Super. Ct. 1995) ("[I]n the case of a disputed oral contract, what was said and done by the parties, as well as what was intended by what was said and done by the parties, are questions of fact to be resolved by the trier of fact."); <u>see also</u> <u>Philips Bros. Elec. Contractors, Inc. v. Great Am. Ins. Co.</u>, 133 F. App'x 815, 816 (3d Cir. 2005).  Therefore, the parties' disagreement as to the terms of the contract cannot be resolved at this stage.

The parties also dispute whether the oral contract was formed between Strategic and Wentz or between Strategic and Wentz's employer, CPS.  (Doc. 16 ¶¶ 5-6; Doc. 29 ¶¶ 5-6.)  Defendants maintain that Wentz was not a party to the contract and that, as a result, Wentz cannot be held personally liable for a breach of that contract.  <u>See</u> <u>Electron Energy Corp. v. Short</u>, 597 A.2d 175, 177 (Pa. Super. Ct.

---

[10] Wentz maintains that his only obligation to Strategic was to facilitate the agreed-upon training programs.  (Doc. 31 ¶ 15.)  Strategic maintains that Wentz was also obligated to:  (1) "persuade" York to move forward with organization-wide implementation of the Counselor Salesperson program, (2) "tailor" the program to meet York's needs, (3) refrain from competing with Strategic for York's business, (4) refrain from revealing Strategic's price structure to York, and (5) refrain from directly billing York for services provided.  (Doc. 14 ¶¶ 14, 15; Doc. 17, Ex. 11 at 2.)

1991) (holding that an individual cannot be liable for a breach of contract unless that individual is a party to the contract).  To support their contention, defendants point out that Strategic was invoiced for all facilitation services by CPS and that Strategic paid for those services by check made payable to CPS.  (Doc. 17, Ex. 3.) To the contrary, Strategic maintains that it contracted directly with Wentz, rather than with CPS.  To support its contention, Strategic points to the affidavit of its Vice-President, Glenn Mehnert, in which Mr. Mehnert asserts that he negotiated the oral contract directly with Wentz.  (Doc. 13 ¶¶ 15-17.)  As construed in the light most favorable to Strategic, these facts are sufficient for a reasonable juror to infer that Wentz was a party to the contract.  Accordingly, this portion of defendant's summary judgment motion will be denied.[11]

**B.**     **Strategic's Breach of Implied Covenant of Good Faith and Fair Dealing Claim**

Strategic has brought claims for both breach of contract and breach of the implied covenant of good faith and fair dealing against Wentz.  Pennsylvania law does not recognize a separate claim for breach of the implied covenant of good faith and fair dealing.  Blue Mountain Mushroom Co. v. Monterey Mushroom, Inc., 246

---

[11] Defendants also argue that Wentz cannot be held personally liable on Strategic's promissory estoppel claim.  (See Doc. 18 at 20.)  Promissory estoppel is an equitable doctrine that "sounds in contract law."  Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000).  Promissory estoppel is used to avoid injustice by making enforceable "a promise made by one party to the other when the promisee relies on the promise and therefore changes his position to his own detriment."  Id.  If such a promise was made in this case, it remains unclear whether the promise was made by Wentz or by CPS.  Therefore, summary judgment on Strategic's promissory estoppel claim will be denied.

F. Supp. 2d 394, 400-01 (E.D. Pa. 2002); <u>Somers v. Somers</u>, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992).  Therefore, defendants' motion for summary judgment on this claim will be granted.

### C.    **Strategic's Tort Claims**

Strategic has brought claims of breach of fiduciary duty and tortious interference against both Wentz and CPS.  Defendants challenge these claims on the basis of:  (1) the "gist of the action" doctrine, and (2) Wentz's absence of individual liability.  Defendants also challenge Strategic's ability to establish the elements of these claims.

### 1.    **"Gist of the Action" Doctrine**

Defendants contend that Strategic's tort claims are barred by the "gist of the action" doctrine.[12]  The gist of the action doctrine is designed to "maintain the conceptual distinction between breach of contract claims and tort claims" by preventing plaintiffs from "re-casting ordinary breach of contract claims into tort

---

[12] Defendants also contend that the economic loss doctrine bars Strategic's tort claims.  (<u>See</u> Doc. 15 at 5.)  However, the economic loss doctrine is generally reserved for products liability cases where "one party contracts for a product from another party and the product malfunctions, injuring only the product itself." <u>Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.</u>, 247 F.3d 79, 104 n.11 (3d Cir. 2001).  Given that the instant case does not involve products liability, the economic loss doctrine is inapplicable

claims."[13] <u>Etoll, Inc. v. Elias/Savon Adver., Inc.</u>, 811 A.2d 10, 14 (Pa. Super. Ct. 2002).  The mere existence of a contractual relationship between two parties does not preclude one party from bringing a tort claim against the other.  <u>Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.</u>, 247 F.3d 79, 104 (3d Cir. 2001). However, when a tort claim is based upon one party's failure to fulfill his or her contractual duties, the claim can be maintained only if the "gist" of the claim sounds in tort.  <u>Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.</u>, 40 F. Supp. 2d 644, 651 (W.D. Pa. 1999); <u>see also</u> <u>Redev. Auth. v. Int'l Ins. Co.</u>, 685 A.2d 581, 590 (1996).  In other words, a tort claim prevails only if the contract is "collateral" to conduct that is primarily tortious.  <u>Bohler-Uddeholm</u>, 247 F.3d at 103.

To ascertain whether a claim sounds in contract or tort, a court must determine the source of the duty that has been breached.  <u>Etoll</u>, 811 A.2d at 14. Contract actions lie for breaches of duties "imposed by mutual consensus agreements between particular individuals," while tort actions lie for breaches of duties "imposed by law as a matter of social policy."  <u>Id.</u>  In the action *sub judice*,

---

[13] The Pennsylvania Supreme Court has not expressly adopted the gist of the action doctrine. <u>Jodek Charitable Trust, R.A. v. VerticalNet, Inc.</u>, 412 F. Supp. 2d 469, 478 (E.D. Pa. 2006).  However, the Pennsylvania Superior Court and numerous federal courts have predicted that it would.  <u>See, e.g.</u>, <u>Etoll, Inc. v. Elias/Savon Adver., Inc.</u>, 811 A.2d 10, 14 (Pa. Super. Ct. 2002); <u>Chemtech Int'l, Inc. v. Chem. Injection Techs., Inc.</u>, 170 F. App'x 805, 808-09 (3d Cir. 2006); <u>Jodek</u>, 412 F. Supp. 2d at 478; <u>Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.</u>, 40 F. Supp. 2d 644, 651 (W.D. Pa. 1999); <u>Ingersoll-Rand Equip. Corp. v. Transp. Ins. Co.</u>, 963 F. Supp. 452, 454 (M.D. Pa. 1997).

defendants allege that the duties at issue were imposed solely by contract.[14]

However, Strategic argues that defendants owed a fiduciary duty of loyalty, which

imposed obligations on defendants as a matter of social policy.  (Doc. 28 at 22.); see

also Bohler-Uddeholm, 247 F.3d at 105.

A breach of fiduciary duty claim may survive the gist of the action doctrine

where "the fiduciary relationship in question is well-established and clearly defined

by Pennsylvania law or policy."  Ginley v. E.B. Mahoney Builders, Inc., No.

Civ.A. 04-1986, 2005 WL 27534, at *2 (E.D. Pa. Jan. 5, 2005); see also Bohler-

Uddeholm, 247 F.3d at 104-05.  Examples of such well-established relationships

include the relationship between attorneys and their clients, between majority and

minority shareholders, and between joint venturers.  Ginley, 2005 WL 27534, at *3.

However, a breach of fiduciary duty claim is barred by the gist of the action

doctrine if the fiduciary relationship arises solely from a contract and not as a

matter of social policy.  See, e.g., Jodek Charitable Trust, R.A. v. VerticalNet, Inc.,

412 F. Supp. 2d 469, 478 (E.D. Pa. 2006) (dismissing breach of fiduciary duty claim

---

[14] According to Strategic, the oral contract between the parties imposed upon
defendants a number of duties, including:

> Supporting the sales person in completing sales to the client, delivering the
> Wilson Learning Program according to the program Leader guide, neither
> engaging in discussions of nor revealing prices or costs to the client,
> conducting all work with the client through the sales person, billing for all
> services rendered through the salesperson, offering services to the client only
> with the sales person's consent, [and] not competing with the sales person for
> the client's business.

(Doc. 17, Ex. 11 at 2.)

because it replicated breach of contract claim); <u>Ginley</u>, 2005 WL 27534, at *2 (same);

<u>Haymond v. Lundy</u>, Nos. 99-5015, 99-5048, 2000 WL 804432, at *8 (E.D. Pa. June 22,

2000) (same).  In this case, a fiduciary relationship does not arise as a matter of

social policy.  If such a relationship exists, it arises solely because of the contractual

arrangement between the parties. Therefore, the gist of the action doctrine bars

Strategic's breach of fiduciary duty claim, and defendant's motion for summary

judgment on this claim will be granted.[15]

    Defendants also contend that Strategic's tortious interference with contract

claims are barred by the gist of the action doctrine.  A tortious interference claim

may be barred by the gist of the action doctrine when it involves a duty not to

compete that was imposed by contract.  <u>See, e.g.</u>, <u>Chemtech Int'l, Inc. v. Chem.</u>

---

[15] Strategic asserts that Wentz owed the company a fiduciary duty of loyalty because he was acting as its agent.  In Pennsylvania, the elements of agency are: (1) a "manifestation by the principal that the agent shall act for him," (2) "the agent's acceptance of the undertaking," and (3) the parties' understanding that "the principal is to be in control of the undertaking."  <u>Basile v. H &  R Block, Inc.</u>, 761 A.2d 1115, 1120 (Pa. 2000).  The parties' intention to create an agency relationship may be explicitly stated or implied from their conduct.  <u>Goodway Mktg., Inc. v. Faulkner Adver. Assoc., Inc.</u>, 545 F. Supp. 263, 266 (E.D. Pa. 1982).  To create an implied agency relationship, the parties' conduct must be a matter of consequence or trust, such as exercising "the ability to actually bind the principal or alter the principal's legal relations."  <u>Etoll</u>, 811 A.2d at 22.

    Most arms-length contracts for professional services involve a great degree of trust between the parties; however, these contracts are not "converted as a matter of course into fiduciary relationships."  <u>Ginley</u>, 2005 WL 27534, at *4.  It is only when one party begins to exert "overmastering influence" over the other that a fiduciary relationship is formed.  <u>Id.</u> at *5.  In this case, there is no evidence that either party was vested with or exercised any powers beyond those typical of arms-length contracts for professional services.  Therefore, the court finds that, even if the gist of the action doctrine is deemed inapplicable, Strategic has failed to establish its breach of fiduciary duty claim.

<u>Injection Techs., Inc.</u>, 170 F. App'x 805, 808-09 (3d Cir. 2006) (dismissing tortious interference claim because the defendant's duty not to compete was contractual). In the action *sub judice*, the parties dispute whether a duty not to compete was imposed by the oral contract between the parties.[16]  Therefore, at the summary judgment stage, the gist of the action doctrine does not bar Strategic's tortious interference with contract claims.

2.     <u>**Wentz's Liability in his Individual Capacity**</u>

Defendants contend that at all times material to this lawsuit, Wentz acted solely on behalf of CPS and that, as a result, Strategic cannot maintain its tortious interference with contract claims against Wentz in his individual capacity.  Under Pennsylvania law, an officer of a corporation who "takes part in the commission of a tort by the corporation" may be held personally liable for the tortious activity. <u>Bohler-Uddeholm</u>, 247 F.3d at 105.  The fact that the corporation may also be held vicariously liable does not "relieve the individual of his responsibility."  <u>Wicks v. Milzoco Builders, Inc.</u>, 470 A.2d 86, 90 (Pa. 1983).

In the action *sub judice*, Wentz is CPS's president and sole shareholder. (Doc. 16 ¶ 1; Doc. 29 ¶ 1.)  Even if the allegedly tortious acts were committed by CPS, Wentz could still be held personally liable to the extent that he participated in the tortious acts.  Therefore, this theory fails to bar Strategic's tortious interference with contract claims.

---

[16] <u>See</u> <u>supra</u> note 10.

### 3.     **Ability to Establish Elements of Tortious Interference**

To establish a tortious interference with contract claim under Pennsylvania

law, a plaintiff must prove:

(1)     the existence of a contractual, or prospective contractual
        relation between the [plaintiff] and a third party;
(2)     purposeful action on the part of the defendant, specifically
        intended to harm the existing relation, or to prevent a
        prospective relation from occurring;
(3)     the absence of privilege or justification on the part of the
        defendant; and
(4)     the occasioning of actual legal damage as a result of the
        defendant's conduct.

CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc., 357 F.3d 375, 384 (3d

Cir. 2004); see also Buskirk v. Apollo Metals, 307 F.3d 160, 172 (3d Cir. 2002).  The

contractual relationship at issue may be either existing or prospective.   Nathanson

v. Med. Coll. of Pa., 926 F.2d 1368, 1392 (3d Cir. 1991).  A prospective contractual

relationship is "more than a mere hope" but "less than a contractual right."

Santana Prods. Inc. v Bobrick Washroom Equip., Inc., 401 F.3d 123, 140 (3d Cir.

2005).

In the action *sub judice*, Strategic raises tortious interference with contract

claims regarding two distinct contracts—an existing contract with Wilson and a

prospective contract with York.  Each of these contracts will be discussed in turn.

### a.     **Existing Contract with Wilson**

Strategic and Wilson entered into a contract, pursuant to which Strategic

agreed to become an "authorized representative" of Wilson.  (Doc. 17, Ex. 12.)

Strategic alleges that defendants tortiously interfered with this contract by:

17

(1) asking Wilson to intervene to resolve the dispute between the parties,[17] and

(2) persuading Wilson to deliver written materials directly to York.[18]  However,

Strategic has failed to prove that it has suffered any injury as a result of defendants'

actions.  CGB Occupational Therapy, Inc., 357 F.3d at 384 ("[A] tortious

interference claim does not accrue until, at least, the plaintiff suffers injury . . . as a

result of the defendant's conduct.").  First, Wilson declined all of defendants'

requests to intervene in the dispute with Strategic.[19]  Second, the contract between

Wilson and Strategic expressly permits Wilson to provide written materials directly

to a customer when that customer is unwilling to work with its Wilson

representative.[20]  In this case, York was unwilling to work with Strategic and asked

Wilson to supply the necessary materials directly.  (See Doc. 17, Ex. 5.)  When

Wilson did so, it was acting in full compliance with its contract with Strategic.

Third, Strategic remains an "authorized representative" of Wilson.  (Doc. 16 ¶ 22;

Doc. 29 ¶ 22.)  Accordingly, defendants' motion for summary judgment will be

---

[17] See supra Part I.C.4.

[18] See supra Part I.C.3.

[19] To the contrary, Wilson notified Wentz that it was not "responsible for resolving costs, expenses, debts, claims, liabilities and obligations sustained in connection with York International and Strategic Learning Incorporated." (Doc. 14, Ex. A.)

[20] The relevant language of the contract is as follows: "In addition, [Wilson] will have the right to sell Products and Programs to a Protected Customer of the Representative if that Protected Customer is unwilling to work with the Representative."  (Doc. 27, Ex. 12 at ¶ 2C.)

granted with respect to Strategic's claim of tortious interference with the Wilson contract.

### b.     Prospective Contract with York

Strategic alleges that it had established a prospective contractual relationship with York regarding organization-wide implementation of the Counselor Salesperson training program.  (Doc. 13 ¶ 56.)  Strategic further alleges that defendants tortiously interfered with this prospective contractual relationship by:  (1) providing independent consulting services to York,[21] and (2) billing York directly for work that had been performed.[22]  (Doc. 23 at 19.)

To establish a claim for tortious interference with a prospective contract, the plaintiff must prove that there was a "reasonable probability" that the parties would have entered into a contract absent the defendant's interference. Nathanson, 926 F.2d at 1392.  In the action *sub judice*, a question of fact remains as to whether there was a "reasonable probability" that Strategic and York would have entered into a contract absent defendants' interference.  In his affidavit, Strategic's Vice-President asserts that York had "previously committed" to organization-wide implementation of the Counselor Salesperson program.  (Doc. 13 ¶ 56.)  On the other hand, York's Sales Training Manager asserts that York has not made "any promise or representation to Strategic Learning, Inc. that York

---

[21] See supra Part I.C.1.

[22] See supra Part I.C.3.

19

International or any of its business units would contract with Strategic Learning, Inc. for future consulting work." (Doc. 17 ¶ 7.) In light of this obvious factual dispute, defendants' motion for summary judgment will be denied with respect to Strategic's claim of tortious interference with the York contract.

### D. **Strategic's Ability to Establish Damages**

According to defendants, all of Strategic's claims fail because Strategic has not established proof of damages.[23] Strategic alleges that it suffered damages in the form of lost profits. (Doc. 28 at 18.) In Pennsylvania, lost profits may be recovered if: (1) the evidence establishes the damages with reasonable certainty, (2) the damages were the proximate consequence of the wrong, and (3) the damages were reasonably foreseeable. Brisbin v. Superior Valve Co., 398 F.3d 279, 289 (3d Cir. 2005).

In this case, Strategic's alleged lost profits are not so speculative that they evade reasonable calculation. Such damages could be calculated by reference to Strategic's past profits from its contracts with York or with other similar companies. Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 681 (3d Cir. 2001) ("When a business has become established, [there are] several methods of proof to

---

[23] Proof of damages is an element of each of Strategic's remaining claims. See CGB Occupational Therapy, Inc., 357 F.3d at 384 (discussing the "actual legal damage" element of a tortious interference claim); Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (discussing "resultant damages" element of a breach of contract claim); Thatcher's Drug Store, Inc. v. Consol. Supermarkets, Inc., 636 A.2d 156, 163 (Pa. 1994) (discussing "injury or detriment" element of a promissory estoppel claim).

establish prospective lost profits:  (1) evidence of past profits; (2) profits made by others or by similar contract where the facts were not greatly different; [or] (3) testimony of experts.").  Furthermore, Strategic adduced evidence that it suffered some loss as a result of defendant's conduct.  Gardner v. Calvert, 253 F.2d 395, 399 (3d Cir. 1958) ("It is settled that in establishing loss of future profits it is only the fact that some loss has resulted from the defendant's breach of contract which must be proved with certainty.").  The parties agree that York has put all future programs with Strategic "on hold" because of the unrest between Strategic and Wentz. (Doc. 13, Ex. 8 at 1.)  Accordingly, defendants' motion for summary judgment will be denied on the ground that Strategic cannot prove damages.

## E.  Defendants' Breach of Contract Counterclaim

Defendants assert that they are entitled to summary judgment on their breach of contract counterclaim.  Under Pennsylvania law, a party asserting a breach of contract claim must demonstrate: (1) the existence of a contract and its essential terms, (2) a breach of a duty imposed by that contract, and (3) damages arising from the breach.  Corestates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999); see also Gazarov ex rel. Gazarov v. Diocese of Erie, 80 F. App'x. 202, 206 (3d Cir. 2003).  Here, it is undisputed that Strategic agreed to pay Wentz $3,000 per day for facilitation services.  (Doc. 16 ¶ 14.)   It is also undisputed that Wentz provided five days of facilitation services to Strategic for which Wentz was never paid.  (Doc. 16 ¶¶ 15, 17.)

While these facts establish a prima facie case of breach of contract, Strategic alleges that its duty to perform under this contract had been discharged by defendants' prior breach. Specifically, Strategic alleges that defendants materially breached the contract by: (1) providing "independent consulting" to York,[24] and (2) repeatedly requesting additional compensation from Strategic for work that had previously been performed.[25] One party's *material* breach of a contract excuses the non-breaching party's duty to perform under the contract. Oak Ridge Const. Co. v. Tolley, 504 A.2d 1343, 1348 (Pa. Super. Ct. 1985). Materiality is a question of fact. Forest City Grant Liberty Assocs. v. Genro II, Inc., 652 A.2d 948, 951 (Pa. Super. Ct. 1995); see also Hartman Plastics, Inc. v. Star Intern. Ltd-USA, 1998 WL 23174, at *3 (E.D. Pa. 1998) (denying motion for judgment on the pleadings because issue of materiality of breach was reserved for trier of fact). A reasonable jury could conclude that Wentz materially breached the contract, thus discharging Strategic's duty to perform. Accordingly, defendants' motion for summary judgment on this counterclaim will be denied.

## IV.   Conclusion

For the foregoing reasons, the court will grant defendants' motion for summary judgment with respect to Strategic's claims of breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and tortious

---

[24] See supra Part I.C.1.

[25] See supra Part I.C.3.

22

interference with the Wilson contract.  Defendants' motion for summary judgment will be denied in all other respects.  Additionally, Strategic's motion for summary judgment will be denied.

An appropriate order will issue.


                                        S/ Christopher C. Conner
                                        CHRISTOPHER C. CONNER
                                        United States District Judge


Dated:        November 29, 2006

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STRATEGIC LEARNING, INC.,** | : | **CIVIL ACTION NO. 1:05-CV-0467** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **THOMAS WENTZ and CORPORATE** | : | |
| **PERFORMANCE SYSTEMS,** | : | |
| | : | |
| **Defendants** | : | |

**ORDER**

AND NOW, this 29th day of November, 2006, upon consideration of

defendants' motion for summary judgment (Doc. 15), and plaintiff's motion for

partial summary judgment (Doc. 22), and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1. Defendants' motion (Doc. 15) for summary judgment is GRANTED in part and DENIED in part as follows:

   a. Defendants' motion (Doc. 15) is GRANTED with respect to plaintiff's claims of breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and tortious interference with the plaintiff's contract with Wilson Learning Corporation.

   b. Defendants' motion (Doc. 15) is otherwise DENIED. See FED. R. CIV. P. 56(c).

2. Plaintiff's motion (Doc. 22) for partial summary judgment is DENIED. See FED. R. CIV. P. 56(c).

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge